UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICK HAGGERTY,
    *Plaintiff*,

v.    No. 3:19-cv-00507 (JAM)

KAYCAN, LTD.,
    *Defendant.*

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This is a lawsuit filed by Patrick Haggerty against Kaycan, Ltd. alleging disability discrimination in violation of the Connecticut Fair Employment Practices Act. Haggerty alleges that Kaycan terminated his employment because of his disability involving "mini-strokes" that resulted in two hospitalizations.

Kaycan now moves for summary judgment. I conclude that Haggerty has not established a genuine issue of fact to show that he has a chronic disability within the meaning of the Act, that he suffered an adverse employment action, or that his employment was terminated because of any disability. Accordingly, I will grant Kaycan's motion.

### BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) statements and supporting documents. The facts are presented in the light most favorable to Haggerty as the non-moving party.

Kaycan is a manufacturer of exterior home improvement products.[1] In March 2009, Haggerty began working as a warehouse lead at one of Kaycan's branches in Bristol,

---

[1] Doc. #36-2 at 1 (¶ 1).

1

Connecticut.[2] Haggerty was promoted to Customer Service Administrator in December 2011 and received several pay raises while working for Kaycan.[3]

Haggerty repeatedly expressed interest in promotions, and he discussed an open position for operations manager with Susan Copen, Kaycan's Director of Administration.[4] Haggerty alleges that Copen "promised" the position to him, although he acknowledged that Kaycan would consider other candidates for the position.[5] As of April 2017, Kaycan's management team expressed reservations about promoting Haggerty to the position due to ongoing issues at the Bristol branch, but Haggerty was still under consideration for the position throughout his time at Kaycan.[6]

In December 2016, Haggerty "suffered a minor Transient Ischemic Attack, or mini-stroke," for which he was hospitalized for three to four days and missed approximately ten days of work.[7] Haggerty "was cleared to work without restrictions after that time."[8]

In March 2017, Haggerty left a voicemail with and sent an email to Kaycan's Human Resources Manager, Elena Spensley, in which he expressed concerns about personnel issues at his workplace.[9] At that time, Haggerty "expressed a great number of concerns that [he] was dealing with concerning the staff at the branch level and the lack of support [he] was receiving from [his] Manager in regards to them."[10]

---

[2] *Ibid.* (¶¶ 2, 4).
[3] *Id.* at 2 (¶¶ 5-6).
[4] *Id.* at 5 (¶¶ 21-23).
[5] *Id.* at 7 (¶ 30).
[6] *Id.* at 8-9 (¶¶ 33-39).
[7] *Id.* at 2 (¶¶ 7-9).
[8] *Ibid.* (¶ 9).
[9] *Id.* at 10 (¶¶ 43-44).
[10] Doc. #31-7 at 2 (Haggerty's email of September 11, 2017 describing what he previously told Spensley).

In May 2017, Haggerty suffered a second mini-stroke that resulted in him spending four to five days in the hospital and missing about two weeks of work.[11] Haggerty "did not have any restrictions upon discharge from the hospital following the second mini-stroke, and was able to return to work at full capacity thereafter."[12] He "did not need any type of accommodation and was able to perform all of the essential functions of his job once he returned to work after each mini-stroke."[13]

Haggerty "did not have any reason to believe that he would miss significant time from work in the future due to a mini-stroke, and acknowledged that Kaycan had no reason to think that either."[14] He suffered from headaches following the second hospitalization, and if the headache was particularly severe it could impact his ability to work, though he also had headaches prior to his mini-strokes that could cause him to miss work.[15] Haggerty did not receive a disability rating for either of the mini-strokes.[16]

When asked in his deposition "to the best of your knowledge, did anyone at Kaycan regard you as disabled?" Haggerty responded "[n]ot that I'm aware of."[17] However, Haggerty states that on a phone call with Copen and Regional Manager Tony Picciano after his second hospitalization, he was "berated" for behaviors that he had engaged in over the course of his employment and that only became an issue following his second hospitalization.[18] Haggerty also alleges that on the phone call an unspecified person mentioned that Haggerty had missed time from work, and Haggerty links this anonymous comment to his alleged disability because the

---

[11] Doc. #36-2 at 3 (¶¶ 11-12).
[12] *Id*. at 4 (¶ 15).
[13] *Ibid*. (¶ 16).
[14] *Ibid*. (¶ 17).
[15] *Ibid*. (¶ 16); Doc. #31-2 at 29-30.
[16] Doc. #36-2 at 4 (¶ 18).
[17] Doc. #31-2 at 53.
[18] *Id*. at 36-38; Doc. #36-1 at 9.

3

only time that he had been out of work for a significant amount of time was his hospitalization for his mini-strokes.[19]

On August 1, 2017, Haggerty emailed Kaycan detailing the personal conflicts and staffing issues at the Bristol branch, including that attendance issues and lack of communication were "adversely affecting our ability to service our customers" and that the Bristol branch was "in desperate need of clear leadership and management."[20] By at least August 29, 2017, Haggerty was considering whether to resign from Kaycan.[21]

On September 11, 2017, Haggerty sent an email to Spensley "as a way to document [his] concerns" and stating "it is in [his] best interest to get this recorded in a written form."[22] This lengthy email did not raise any concern about Haggerty's medical condition or state any belief that he was being subject to unfair treatment by reason of any disability.

On September 12, 2017 at 11:53 am, Haggerty voluntarily sent a resignation letter to Kaycan via email and regular mail that stated "I am sending this letter to inform you of my immediate resignation from my position as Customer Service Team Lead at the Bristol, CT branch of Kaycan, Ltd."[23] The letter stated that his resignation was due to the "hostile work environment that I have been experiencing for much of the last five months."[24] Haggerty testified in his deposition that he resigned because he "felt like [he] had finally reached [his] breaking point" and "wasn't going to be put in that position any longer where … [he] was being disrespected," and that "at the end of the day it was about being ignored."[25]

---

[19] Doc. #31-2 at 111-12.
[20] Doc. #36-2 at 10-11 (¶¶ 45-46).
[21] Id. at 17 (¶ 71).
[22] Id. at 12 (¶¶ 51-52); Doc. #31-7 at 2-3 (Ex. 7).
[23] Doc. #36-2 at 15-16 (¶¶ 63-64); Doc. #31-10 (Ex. 10).
[24] Doc. #36-2 at 16 (¶ 67).
[25] Id. at 16-17 (¶¶ 66, 68).

4

Spensley responded at 12:16 pm stating "I am acknowledging the receipt of your letter of resignation and understand that your last day with Kaycan is today."[26] But, according to Haggerty, he spoke to Spensley by telephone at some point later that afternoon, and Spensley stated "her desire to not accept the letter and for [Haggerty] to come back and that [Spensley] would be there the following week to discuss all of these issues with [Haggerty] as well as everybody else at the branch."[27] At that point, Haggerty did not understand his resignation to have gone into effect, and he went back into work.[28]

At 1:28 pm, Spensley emailed Kaycan's management, with Haggerty copied, stating "Patrick has reached out to me just now and has asked to rescind his resignation."[29] Haggerty maintains that statement is a lie and that it was Spensley who asked him to rescind his resignation.[30] Spensley's email also stated "[w]e have agreed that Susan [Copen] and I will be coming to Bristol on September 20th to meet with the team, so we can address some of these on-going concerns, and develop the plan for moving forward."[31]

At 6:32 pm, Spensley emailed Haggerty stating that Kaycan had decided to accept his resignation:

> You submitted your letter of resignation to Kaycan today, 9/12/17. Later on today, you contacted me to discuss it and, in the course of our conversation, you decided to rescind your resignation. Initially, we agreed that you will return to work tomorrow, 9/13/17. However, upon further consideration, the company management decided, that given how dissatisfied you have been with your employment at Kaycan, it is in the best interest for us to accept your resignation.[32]

---

[26] *Id*. at 17 (¶ 69).
[27] Doc. #36-4 at 40; *see also id.* at 42 ("we spoke about her desire to not have me leave the company, that she would very much like to have me stay until at least the following week").
[28] *Id*. at 40.
[29] Doc. #36-2 at 18 (¶ 74); Doc. #31-12 (Ex. 12).
[30] Doc. #36-4 at 43.
[31] Doc. #31-12 at 2.
[32] Doc. #36-2 at 19 (¶ 77).

5

Haggerty responded a few minutes later stating "[t]hank you again for your response and for your time. It was very much appreciated."[33]

In April 2019, Haggerty filed this one-count lawsuit alleging that Kaycan terminated him because of his disability in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-51 *et seq*. Kaycan, a Delaware corporation with its principal place of business in Vermont, removed this action to federal court on the basis of diversity jurisdiction. Kaycan now moves for summary judgment.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proven at trial—to allow a reasonable jury to decide the case in favor of the opposing party. The Court's role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

Disability discrimination claims under CFEPA are subject to the familiar *McDonnell Douglas* burden-shifting standard. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Green v. Cellco P'ship*, 218 F. Supp. 3d 157, 162 (D. Conn. 2016). "In the disability context, a prima facie case for disparate treatment is established under the *McDonnell Douglas*

---

[33] *Ibid*.

*Corp.* framework if the plaintiff shows: (1) he suffers from a disability or handicap, as defined by the applicable statute; (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and that (3) the defendant took an adverse employment action against him because of, in whole or in part, his protected disability." *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 426 (2008).[34]

If the plaintiff succeeds in meeting this initial burden, then the employer may counter by proffering a legitimate, nondiscriminatory reason for its action. *See Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015). Then, if the employer does so, the plaintiff may still succeed on his claim if he can show that the proffered reason was a "pretext" for discrimination—that is, by showing that his employer's stated reason was untrue or incomplete and that it was discrimination that played a causal role in his termination. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010); *see also DeAngelo v. Yellowbook, Inc.*, 105 F. Supp. 3d 166, 174-78 (D. Conn. 2015).

Kaycan does not dispute that it is subject to CFEPA or that Haggerty was able to perform the essential functions of his job. I will address instead the disputed elements of the *McDonnell Douglas* analysis in turn.

### *Protected disability*

Starting with the first prong of the *prima facie* case, CFEPA provides that a person is disabled if he has "any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness." Conn. Gen. Stat. § 46a–51(15). "Because this definition does not include the requirement that a major life activity

---

[34] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

be substantially limited, it is generally regarded as broader in scope than the [federal Americans with Disabilities Act's] definition of disability." *Green*, 218 F. Supp. 3d at 164.

Haggerty asserts that he is physically disabled within the meaning of CFEPA because he was twice hospitalized for suspected mini-strokes, and his "disability is chronic because he had two incidents separated by approximately six months."[35] Kaycan counters that Haggerty has provided no evidence that he suffers a chronic disability.[36]

"Because the term 'chronic' has no statutory definition, the Superior Court has relied on the dictionary definition of chronic in analyzing a physical disability claim under CFEPA." *Phadnis v. Great Expression Dental Centers of Connecticut, P.C.*, 170 Conn. App. 79, 85 n.1 (2017) (collecting cases). Some "[c]ourts have utilized the definition provided by *Black's Law Dictionary* … which defines 'chronic' as 'of long duration, or characterized by slowly progressive symptoms; deepseated and obstinate, or threatening a long continuance; distinguished from acute,'" while "[o]ther Connecticut courts have held 'chronic' to similarly mean 'marked by long duration or frequent recurrence or always present or encountered.'" *Fasulo v. HHC Physicianscare, Inc.*, 2016 WL 3266434, at *4 (Conn. Super. Ct. 2016) (collecting cases); *see also Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 88 (D. Conn. 2006) (referencing same definitions for chronic).

Haggerty has not created a genuine issue of material fact that he has a chronic disability under these definitions. He alleges his mini-strokes are a chronic disability because they occurred twice, about six months apart, and each resulted in hospitalization. But it is undisputed that Haggerty did not have any restrictions and was able to work at "full capacity" without any

---

[35] Doc. #36-1 at 14.
[36] Doc. #30 at 7-8; Doc. #40 at 1-3.

accommodation following his mini-strokes.[37] He admits that he "did not have any reason to believe that he would miss significant time from work in the future due to a mini-stroke, and acknowledged that Kaycan had no reason to think that either."[38]

The only potentially "chronic" symptom Haggerty identifies is headaches, but Haggerty suffered from headaches before he had the mini-strokes that he alleges are his chronic disability.[39] At oral argument, Haggerty's counsel argued that headaches could be a symptom of a stroke, but he has not offered any medical evidence to support that claim. Indeed, Haggerty has not pointed to a disability rating or any medical evidence whatsoever in support of his argument that he has a chronic disability.

As a result, Haggerty has not met his burden for his *prima facie* case because CFEPA requires corroborating evidence for a claim of a chronic disability. *See Buotote v. Illinois Tool Works, Inc.*, 815 F. Supp. 2d 549, 557 & n.10 (D. Conn. 2011). Summary judgment is warranted when—as here—a plaintiff "offers no medical support in the record … for his assertion that his impairment is chronic as required under the CFEPA." *Id*. at 557; *see also id.* at 558 ("Because Plaintiff provides no evidence of his disability beyond his own testimony and a disability rating that lacks context or other helpful guidance, from which the extent or duration of his impairment or limitation may be discerned, and more is required in the Second Circuit, Plaintiff has failed to demonstrate ADA or CFEPA disability, and summary judgment will enter on his CFEPA claim."); *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 212 (D. Conn. 2012) (dismissing plaintiff's CFEPA claim that "only alleges that she suffers from transverse myelitis

---

[37] Doc. #36-2 at 2, 4 (¶¶ 9, 15).
[38] *Ibid*. (¶ 17).
[39] Doc. #31-2 at 29-30.

and has pled no other facts indicating that this condition is 'chronic' within the meaning of CFEPA").

Moreover, the record evidence makes clear that Haggerty's hospitalizations were due to "acute" rather than "chronic" conditions (because they were resolved after his hospitalizations), that Haggerty could work at full capacity after his mini-strokes, and that his mini-strokes are not longstanding, frequently recurring, or always present. Connecticut courts routinely hold that plaintiffs with allegations similar to Haggerty's cannot maintain CFEPA disability discrimination claims because their alleged disabilities are not chronic. For example, in *Boutillier v. Hartford Pub. Sch.*, 221 F. Supp. 3d 255 (D. Conn. 2016), the court explained:

> [A]lthough she required significant medical leave, plaintiff's surgeries and fainting episodes were acute in nature and caused by discrete events … She does not suffer a chronic physical infirmity. Rather, she had several serious medical events within a single school year. These conditions did not develop and worsen over time but appeared rapidly; they were prototypical acute conditions that were resolved to the extent that plaintiff could work in full capacity by the summer of 2012. Accordingly, summary judgment will be granted in favor of defendant on plaintiff's … CFEPA disability discrimination claims.

*Id*. at 274.

Similarly, in *Logan v. SecTek, Inc.*, 632 F. Supp. 2d 179 (D. Conn. 2009), the court dismissed a CFEPA claim because a plaintiff's back injury was "fully resolved" when the adverse employment action occurred, and the complaint did "not allege any facts indicating that his back injury was of long duration, frequently recurred, or was continuously present." *Id*. at 185. And in *Setkoski v. Univ. of Connecticut Health Ctr.*, 2012 WL 2044802 (Conn. Super. Ct. 2012), the court held that a plaintiff with "a serious medical condition" that caused a three-month leave of absence did not have a "chronic" disability because she "does not allege that her condition is continuing or will require medication or additional procedures in the future" and she stated "that her leave was to *resolve* her medical condition." *Id*. at *3 (emphasis in original).

The cases Haggerty relies on do not support his position that his two hospitalizations for alleged mini-strokes are sufficient to demonstrate that he has a chronic disability to satisfy his *prima facie* burden. In *Adriani v. CHRO*, 220 Conn. 307 (1991), the Connecticut Supreme Court found that the plaintiff was disabled based on a doctor's letter stating "that the plaintiff's hypertension had become a serious problem in recent months" and the plaintiff's taking two weeks of medical leave for high blood pressure immediately before his employment ended. *Id*. at 314 n.7.

In *Gilman Bros. Co. v. CHRO*, 1997 WL 275578 (Conn. Super. Ct. 1997), the court found that a hearing officer's conclusion that an employee's carpal tunnel syndrome was "chronic" was reasonable after one doctor described the plaintiff's "wrist problems as they existed in June of 1991," a second doctor "diagnosed carpal tunnel syndrome in 1992," and a third doctor "diagnosed it in 1994." *Id*. at *5. Although the employer's expert "opined that [the employee's] condition was not chronic because she had only suffered from it for one month at the time of her termination," he also stated "that both tendinitis and carpal tunnel syndrome may be 'chronic' physical conditions" and that the employee's "job experience before working for the [employer] set the stage or provided the background for the development of the carpal tunnel syndrome and contributed to its development." *Id*. at *4.

And in *Martinez v. Connecticut, State Libr.*, 817 F. Supp. 2d 28 (D. Conn. 2011), the court held that "a reasonable jury could infer that [the plaintiff's] asthma was a chronic impairment because she has had her asthma for ten years, her asthma has been of such a severity that an attack once placed her in a coma, and she continues to have asthma to this date." *Id.* at 56. In each of these cases, there was far more evidence suggesting that the employee had a chronic disability than Haggerty can point to here.

Based on the record in this case, no reasonable jury could conclude that Haggerty suffers from a chronic physical disability protected under Conn. Gen. Stat. § 46a–51.[40] Accordingly, Haggerty has not established the first prong of a *prima facie* case of disability discrimination.

### *Adverse employment action*

As to the third prong of the *prima facie* case, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Carter v. Syracuse City Sch. Dist.*, --- Fed. Appx. ----, 2021 WL 912523, at *2 (2d Cir. 2021). Numerous courts have ruled that a defendant's acceptance of a plaintiff's voluntary resignation is not an adverse action. *See Shaw v. Yale New Haven Hosp.*, 2020 WL 1923599, at *8 (D. Conn. 2020) (collecting cases). Nor does a refusal to rescind a voluntary resignation constitute an adverse employment action. *Ibid.* (same). "While a defendant's termination of an employee would constitute an 'adverse employment action,' a defendant's termination of an employee who has resigned does not." *Salen v. Blackburn Bldg. Servs., LLC*, 2017 WL 71708, at *15 (D. Conn. 2017).

In light of Haggerty's voluntary resignation, there is no genuine fact issue to suggest that he was subject to an adverse action. After Spensley officially accepted Haggerty's resignation, Haggerty did not protest but instead thanked her "for [her] response and for [her] time," and stated it was "very much appreciated."[41]

Although the parties dispute some of the interactions between Haggerty and Spensley that afternoon, there is not a genuine issue of material fact over whether Kaycan terminated him. Haggerty does not point to any evidence that Kaycan actually rejected his resignation letter on

---

[40] Because Haggerty bases his disability discrimination claim entirely on his mini-strokes, I have not considered whether he could establish that any other possible health issues, such as migraine headaches or anxiety, are a disability protected under CFEPA.

[41] Doc. #36-2 at 19 (¶ 77).

September 12 or actually allowed him to rescind it before Kaycan formally accepted it later that evening, which Haggerty claims is a "termination." Even Spensley's expressing her "desire to not accept the letter," setting up a meeting for the next week, and Haggerty's "understanding" that his resignation had not gone into effect do not equate to Kaycan officially rejecting his resignation or allowing him to rescind his resignation—which Haggerty maintains he was not asking to do anyway.

Viewed in the light most favorable to Haggerty, the record at most suggests that his employment with Kaycan was in limbo while Kaycan was evaluating whether to accept his resignation, before ultimately deciding to accept it. That does not amount to an adverse employment action, and Haggerty has not pointed to any authority to the contrary. Accordingly, Haggerty has not established the third prong of a *prima facie* case of disability discrimination under CFEPA.

### *Pretext*

Even assuming that Haggerty has established a *prima facie* case of disability discrimination, there is no doubt that Kaycan has proffered a legitimate, nondiscriminatory reason for "terminating" Haggerty that is sufficient to satisfy its burden at the second stage of the *McDonnell Douglas* analysis. As Spensley explained in her email to Haggerty, "the company management decided, that given how dissatisfied you have been with your employment at Kaycan, it is in the best interest for us to accept your resignation."[42] Given Haggerty's numerous complaints to company management expressing his frustrations with issues at the Bristol branch over at least five months, which culminated in his sending a voluntary resignation letter, it is clear that Kaycan had a legitimate, nondiscriminatory basis for accepting Haggerty's resignation.

---

[42] *Ibid*.

That shifts the burden back to Haggerty for the third and final stage of the *McDonnell-Douglas* inquiry, and Haggerty must show a genuine fact issue to suggest that Kaycan's proffered reason was pretextual and that disability discrimination played a causal role in his termination. He cannot do so on the paltry record in this case. Haggerty does not offer any evidence that anyone at Kaycan commented on his disability or treated him differently on account of disability. He does not reference any comparators who were treated differently. He did not need or request any accommodation from Kaycan when he returned from his hospitalizations. Indeed, Haggerty admits that he was not aware of anyone at Kaycan who even regarded him as disabled.

The only evidence that Haggerty puts forward that Kaycan acted because of his disability is his own testimony that, on a conference call with Copen and Picciano sometime in summer 2017, he was "berated" for the first time for longstanding behaviors and that someone mentioned that he had missed time from work, which he interpreted as a reference to his hospitalizations for his mini-strokes. He does not offer any specifics about that conversation—including even which person made the comment—nor any corroborating evidence. That is far from enough to establish a genuine issue of material fact that Kaycan's proffered reason for accepting his resignation was pretextual and that it actually did so because of his disability.

Haggerty argues that Kaycan had been "looking for a way to terminate him," but then argues that Kaycan "begged" him to stay with the company immediately after he submitted his resignation letter before then deciding to "terminate" him.[43] But it makes no sense to argue that Kaycan was looking for a way to terminate him while also begging him to stay. All in all, no

---

[43] Doc. #36-1 at 4, 16.

14

reasonable jury could find that Kaycan's stated reason for "terminating" Haggerty's employment was pretextual or based in part on any disability.

Haggerty's opposition to the motion for summary judgment argues only that Kaycan discriminated against him by terminating his employment because of his mini-strokes. To the extent that Haggerty's complaint could be interpreted as pleading any other theories of disability discrimination, such as failure to accommodate a disability or that Haggerty was "regarded as" disabled by Kaycan, or as alleging any other adverse employment actions, such as constructive discharge or failure to promote, I consider those claims abandoned and do not discuss them further. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016).

## CONCLUSION

For the reasons set forth above, the Court GRANTS Kaycan's motion for summary judgment (Doc. #29). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 15th day of April 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge